Good morning, Your Honors. May it please the Court, my name is Joseph Tregilio, representing Petitioner Hooman Ashkan Panah. I'd like to reserve five minutes of rebuttal, please. Right. Your Honors, the California Supreme Court denied every one of Mr. Panah's claims before it even had jurisdiction for fact development. It did so according to its own rules and purported to do so by accepting Mr. Panah's allegations as true and resolving all inferences in his favor. If it did apply that standard, no reasonable jurist could assume he didn't even raise one prima facie claim for relief. And one of the more blatant examples of the California Supreme Court failing to even grant an evidentiary hearing in this case has to do with a juror who made third-party contact with her preacher about the very matter pending before her, which is whether to sentence Mr. Panah to life or death. And that preacher gave her a biblical passage that gave her peace with that death sentence. But that wasn't the only claim that deserved a hearing in this case. Our certified claim alleges that the prosecutor presented false evidence, or evidence that gave the jury, more importantly, a false impression of a biological link between the victim in this case and Mr. Panah. The only direct evidence, the only direct link tying Mr. Panah to this claim. And that false impression we know is false from the prosecution's own DNA testing that it obtained but decided not to present to the jury. And we also have declarations from all three members of the trial counsel team here, every lawyer, including the investigator, acknowledging they did absolutely no factual investigation to uncover that false evidence and to raise that issue with the jury. Nor did the trial counsel present any forensic experts in this case. And so in sum, the California's failure to follow reasonable rules under this Court's precedent about what's a reasonable fact-finding process by assuming facts are true, it acted unreasonably in not determining that a single prima facie claim was raised here. And I can turn to the certified claim first, if the Court would prefer that. Yes. Why don't we discuss the NAPU claim? I'm sorry, Your Honor? Let's discuss the NAPU claim. Yes, Your Honor. So our NAPU claim centers on the prosecution's presentation of a serologist, an expert serologist, who looked at three items of evidence in this case that had A of those antigens were consistent with Mr. Pinault specifically and the victim mixing fluids, which tied Mr. Pinault to that crime. That mixture theory was false. DNA evidence actually shows that there was no such mixture on those three items of evidence. And in fact, respondent has conceded finally in this Court in its answering brief that one of those items of evidence, the tissue paper, actually does exclude the victim from the results. So that tissue paper is linked to the bed sheet, which is the other item of evidence, and the kimono. Now, did the government conceded that the tissue evidence was untrue? Basically said the fact that that tissue evidence had a false read was immaterial because of the evidence on the bed sheet and the kimono. That's correct, Your Honor. But that if the state court took that argument that the respondent just made, that would be unreasonable. And that's because that tissue paper was linked to the bed sheet for two reasons. Number one, the prosecution argued that the tissue paper and the bed sheet were linked together. I don't mean to be graphic here, but they presented this very graphic depiction of oral copulation that involved the tissue paper being used to spit out ejaculants and saliva, and then the rest of it going on the bed sheet. So the tissue paper by the prosecution were linked together. But number two, I think more importantly, what you have on that tissue paper, again, are A and B antigens. Mr. Pinnall is a B antigen contributor. The victim did not contribute to that tissue paper, meaning somebody else's antigens, who either was an A or an AB contributor, is on that tissue paper. 39.8% of the population have A or AB antigens. It could have been one of Mr. Pinnall's many adult women sexual partners in his bedroom at that time. He had an active dating life, which the record establishes. The trial counsel put on evidence of a woman, for example, Victoria Eckstone, who was a type A contributor who had relationships with Mr. Pinnall in his bedroom. So that tissue paper shows someone else was contributing to the stains on Mr. Pinnall's bedroom. And if you look at the bed sheet, that also, you can't say that the inconclusive findings there really refute our claim, because what we're looking there is a grouping of at least five stains on that bed sheet. Well, counsel, let me ask you specifically, though. In this case, I think there were three special circumstances sought. There was sodomy, lewd axon of minor, and oral copulation, correct? Yes, that's correct. Now, the jury rejected the oral copulation. That's correct. Now, the testimony of the serologist, which I agree with you is, I just, was not what should have been presented in court. I have no doubt about that. But we still have the other evidence in the case, in terms of the victim's body, and the testimony of, I might be mispronouncing the name, Hooser, Hauser? Hauser, the pathologist. So I'm sure your opposing counsel is going to stand up and say, hey, look, yes, we concede that was wrong, but you have the pathologist's testimony, and under AEDPA, that's the end. So in anticipation of that argument, what's your response to that? I think my response has to come in two parts, and I'll get to the specific facts that you mentioned there. But I think we have to make sure that we're understanding that under a NAPU claim, the prejudice standard here is different than other prejudice standards. We're dealing with whether this false evidence had any likelihood of contributing to the verdict. And again, I don't think it's reasonable to say that that serology evidence had no impact on the verdict. It was the only direct evidence linking them together. It was the chain. It was the link in the chain of all the other circumstantial evidence. And I'm quoting there from Miller v. Page. But let me ask you about that, though, because, again, the testimony or the evidence, as I understand the case, was this young girl was found in the closet in a bag. In the bedroom. And then there's other evidence suggesting that he made some comments and we can debate the value of it, but he made some comments that the prosecution at least thought, hey, this shows consciousness of guilt, etc. Why isn't that enough to establish the two special circumstances, either one sodomy or lewd acts on a minor? I think because I think identity is critical here. And I think that absence of serology, I don't think those facts establish identity. And the reason is because Mr. Pinal is not the only one who had access to that bedroom. The last person seen with the victim, Ahmad Sehoun, actually did have access to that bedroom. He was seen leaving the apartment with a suitcase. He was staying with Mr. Pinal and the family in the days leading up to this event. His neighbors had access to his bedroom through a balcony. There was no other blood or any other evidence of a crime in Mr. Pinal's bedroom other than what was in that suitcase that you mentioned in the closet. And so I think even though that circumstantial evidence, there's an inference there, I think absent the direct tie, there could have been a lot more made of all the other evidence the trial counsel attempted to present. And some of the third party evidence he tried to present was excluded by the trial court. But it's not as open and shut without this evidence concerning his identity. An officer noticed when Mr. Pinal was in the room. Just so I'm clear, I want to make sure I understand your argument. So your argument is not that there was insufficient evidence in a sense that sodomy lewd acts occurred. It's just that who did it? Well, I think that's overarching identity. I think if we want to get into the specifics of the special circumstances, I do think serology was important to those specifics. But I think that would have to assume identity. And I don't think we can assume that here. But if you want to look at those specifics, the only thing the prosecution argued for That's all the California Supreme Court cited to when it when it's upheld the sufficiency of the lewd act special. Well, now we know that there wasn't actually ejaculate mixed in with with all this other stuff and part of the crime scene that predated everything was in his bedroom from something else. So I do think we can get specifically into the special circumstances, which we've laid out extensively in briefing that I can talk about. But I do think identity overarching is the more important issue here, given the someone else potentially being involved with this. And we don't this would have been a whole different trial if we didn't have this direct evidence. I think there's a quote and I saw this morning and I'm looking at Miller versus Pate, which is another case where a serologist testified at trial truthfully that there was some blood found on a pair of shorts. But the prosecution used that potentially truthful testimony to say, no, that's actually a bloodstained shorts. It wasn't just that there's a little bit of blood. It gave the impression to the jury that these shorts are bloodstained. And the Supreme Court said that that serology evidence is, quote, an important link in the chain of circumstantial evidence against the petitioner. And in the context of the revolting crime in which he was charged, its gruesomely emotional impact on the jury was incalculable. And that's exactly what we have here. We have a serologist allowing the prosecution to paint a graphic depiction of a crime that's just simply not true. And had that not been presented, this would have been an entirely different case that the defense could have presented in an entirely different way. Although I have to say the circumstantial evidence with regard to identity is pretty compelling. If you're talking about the victim's body being found in a field like that, I think that really highlights the importance of serology evidence. But here you've got the things that Judge Owens mentioned. You've got the body in the suitcase, in the closet. You've got the attempted misdirection when the victim's father came to the door. You've got admissions. You've got consciousness of guilt actions and all occurring within a very short period of time. Then you've got epidefference on that. So I think it's a tougher argument with regard to identity in terms of guilt. Let me ask you this. Does the materiality analysis differ between the guilt phase versus the sentencing phase? Because in the guilt phase, you focus very much on identity, like who committed this crime. It's different questions are being asked and the jury's asked to weigh the aggravation versus mitigation evidence at sentencing. Can you address that? Yes, Your Honor, certainly. I think that there's no question here that the evidence is not only relevant or material rather to the guilt phase, but also the penalty, because the only aggravating factor that the prosecution was better in this case was the one dealing with the nature and circumstances of the crime. That was it. There was no other aggravating evidence against Mr. Pinal. In terms of the penalty phase, it seemed to me, and correct me if I'm wrong or misreading the record, that the prosecution didn't really make much of the tissue evidence during the penalty phase. That was not the focus of the argument. So you've got, I think the best fact for the petitioner in this case is the exclusion of Parker from the tissue. But you've got inconclusive findings with regard to the other stains, or I know that there were multiple stains and some of them were consistent with Mr. Pinal, but it just wasn't the focus of the penalty phase argument. How do you deal with that? If I could, Your Honor, address that in two parts, because you said I think there's a lot to clarify for Your Honor about the inconclusive findings. But in terms of your argument about or comment about how the prosecution used the evidence at the penalty, I don't think they needed to present additional evidence. If you read the prosecution's closing argument at guilt, which the jury heard and considered as part of the nature and circumstances of the crime, it paints a very graphic story, a narrative of this crime that's certainly carried into the jury's considerations at penalty. But in terms of the impact of the DNA results contradicting the serologists on the bed sheet, I think it's important to note that of the five stains that were tested here, two of the five stains were not inconclusive. Two of the five stains that were purportedly from a spewing of the victim's saliva excluded the victim as a contributor. And again, that means that somebody else, not Mr. Pinal, not the victim, contributed to that stain. And if that's the same grouping as the other three which were inconclusive, there's at least a prima facie claim. And I think what we're looking at here is whether there's a prima facie claim, not whether we've proven the case, because I think there can be testimony about what inconclusive means. And what inconclusive means in this context, with DNA typing context, is that when you do DQ alpha testing, there's a typing strip and certain alleles, if there's an allele present, it lights up on the dot and then you weigh that against the control dot. And if it's brighter than the control dot, that allele is present. Well, in this case, the control dot itself was weak and the four allele lit up as weak. And so you couldn't really make much of it. But that doesn't, again, refute our prima facie case here to the state court, because two of the five stains are in the same grouping. That's at least a prima facie inference that all five of them excluded to defend it. And I think we have to take at this point, our experts' testimony is true from their evidence. And until they can be cross-examined or at a hearing, I think the state court had to have accepted that as true. So under the NAPU, I've never been sure how to pronounce NAPU, but in all these years, but is it NAPU, NAPUI? I say NAPUI, I've heard both. OK, under NAPUI, we have to show that the prosecutor knew that this testimony was false or misleading. What evidence is there that the prosecutor knew that there's the argument is from the government, from the warden, that he didn't know that it was false or misleading because although he had the DNA test results that he had had conducted, they were inconclusive on the point. And so he chose to go with the stronger evidence. So I think that there's two items of evidence that demonstrate knowledge, and I think I have to belabor it, raise a prima facie inference of knowledge. And again, we haven't had the ability to subpoena the prosecutors and ask them, did you know yet? We can't do that until a hearing. But the two things that... But could you subpoena them? Are they around? Are they alive? I think, Mr. Berman, the prosecutor is around. The other prosecutor who actually presented this evidence was actually admitted to be a pathological liar. He was disrobed from the bench. I think that raises some red flags on its own. I don't know, but it raises red flags that this person is problematic in terms of what he's willing to present to official tribunals. But I think that the more critical aspect of knowledge here is the fact that the prosecution obtained the results and said on the record that it chose not to present them for tactical reasons, not because it didn't know what they said, but for tactical reasons, the prosecution chose not to present them. Now, that infers knowledge, at least to a prima facie case, and it also was a red flag for trial counsel to say, OK, something's up here. Maybe I should take a look at this and at least get a confidential report. But I think that definitely infers knowledge, the fact that they got the results back and chose not to present them in combination with the problems with this prosecutor. And then in terms of the other evidence that Your Honor mentioned concerning statements, if I could touch on some of those, because you mentioned some statements to the victim's father, for example, by Mr. Pinal. I think, again, when you take away this direct scientific evidence, all these other statements can be explained. So Mr. Pinal's statements to the father, if you look at what the father actually said immediately after the crime to the police in an interview, he actually said that he asked Mr. Pinal, have you seen my daughter? And Mr. Pinal responded, no, why? I can't find her. It wasn't the misdirection that I think came out at trial and that could have been brought out. If you look at his statements to Ronnie Campbell, his girlfriend, Mr. Excuse me. I thought he said, is she missing? That's what came out of trial. Yes, Your Honor. I'm looking at a police interview that he did the day of the interview. The victim's father did the day of the interview. That could have been used to sort of show that maybe the victim's father was misremembering some things by the time of the trial, which is a couple of years later. OK, thank you. And when you look at Mr. Pinal's statements to Ronnie Campbell, the first statement he made was around five o'clock or so at Mervin's. He was working at Mervin's and he said, I did something big. They're going to find out. They have him on tape. And he told his mother to leave the house. And so what does all that mean? I think we have to look at the context here. The day before this crime on the Friday night, he was threatened. It's on tape. He was Mr. Hosseini testified that he received a threatening phone call. He thought somebody was out to get him. And he received a phone call at Mervin's from Officer Barnes, who was in his scene with her. That wasn't true. Mr. Pinal was not the last person seen with her. But he's thinking in his mind that he is being accused of something. And it sent him, I think, into a tailspin. He is someone with a history of going into acute psychosis. He attempted to commit suicide at the age of four. So this is someone who, in face of traumatic situations, does begin to act irrationally and made this comment. And in terms of the big thing he did that's on tape, he had tapes of sexual relationships with adult women in his bedroom, which I don't know that he wanted his girlfriend to find out. And so I don't know if that's what he could have been talking about when he mentioned to Ronnie Campbell that they have me on tape. They didn't find anything, evidence of a crime, when the police actually saw those tapes. They saw those tapes of other women. There wasn't any bad evidence on those tapes. And then you look at his statements to Ms. Campbell the morning after, after he was, I think, undisputably in a state of how she's not alive, et cetera. But again, looking at her police report, which I think puts her statements into context, Ms. Campbell tells Mr. Pinnall, they set me up to look like I did something bad. I wouldn't hurt anybody. They did something bad. Ms. Campbell, that didn't come out at trial. Ms. Campbell said something different. But again, I think what we're looking at here is how this case could have been litigated had that false evidence not been presented to the jury. And this evidence about Ms. Pinnall's bottom line show that he did not confess to this crime and was thinking he was being set up by they or somebody else, could have been cast in a different light, at least when we're considering the prejudice standard. And finally, Your Honor, I'd like to address the AEDPA deference that you mentioned. I think this case is governed by AEDPA, but I think the materiality standard for Napu here, Napui, should be de novo in this case because all indications are that the California Supreme Court was applying a more onerous prejudice standard at the time it resolved these claims than it should have been. And I think we've explained that this case was denied in 2006 and then again in 2011. Well, in 2004 and in 2012, the California Supreme Court was found to have been applying a more onerous prejudice standard, one that matched Brady and ineffective assistance claims. And Johnson, the United States Supreme Court, has instructed us that we need to look at state precedent and assume that state courts follow their own precedent when deciding what materiality standards they apply, particularly when you have a summary denial here and we don't know what they were doing here. But we can assume that they were applying this less onerous prejudice standard. I'm sorry, more onerous prejudice standard to the Napui claim than they should have, because in 2004, they cited this People v. Watson case, a 54 California case, and this court's opinion in Dow v. Verga, I think, explained that. And then in 2012, in In re. Richardson, or Richards rather, the California Supreme Court also, again, was relying on that People v. Watson case to explain its view that Napui claims have a prejudice standard that matches Brady. And that's not the law. That's not clearly established law here. So I think we need to look at that. When we look at materiality for the Napui claim, why do we have to look at the case that could have been presented? Can't we look at the case that was actually presented? So in other words, you reference police reports, and you say that that's more favorable than the actual testimony that was presented at trial. This is what the jury heard. So to the extent that prior statement could have undercut the witness's testimony on the stand, the fact that serology evidence was presented didn't prevent counsel from exploring that on cross-examination, did it? It did not, Your Honor.  And I think the other point is, when you take away the false evidence here, that direct link, there might have been a different effort of putting up a third-party defense here in this case that was not pursued because of counsel's foregone conclusion that we don't need to deal with guilt phase evidence here. We're just trying to settle this case. And I think U.S. v. Bagley, which is a Brady case, talks about when you suppress evidence, you have to look at what the impact of that suppressed evidence would have had on defense preparation. And I think we should do that here, too. I mean, when you have a serologist coming back and saying there's this direct link, I think that led counsel to believe, well, there's nothing I can do. And I think he said so in a Marsden motion, a Marsden where Mr. Pinal actually was trying to get his lawyer to do this DNA testing. It's going to exculpate me. And he said, hey, I'm trying to get my client to settle. This is not something we should be fighting. Because he didn't know what these results meant. But if he didn't have that view and understood that the serology was, in fact, false, I think some of this evidence, much of this evidence could have been presented in a different way. And that's why the presentation of false evidence is so harmful to a litigant and why the prejudice standard is lower, because it's so destructive to what the jury is actually hearing, the truth of what the jury is actually hearing and resolving. I'd like to turn now a little bit to the juror misconduct claim. In that claim, again, a juror reached out to a preacher about the matter pending before, whether it's to seek life or death. That preacher gave her a biblical passage. And that quote gave her peace to decide whether to sentence Mr. Pinal to death, which she did. Under United States Supreme Court law, Remmer versus United States, that warrants a presumption of prejudice. I think this court has said so in Godoy and the Fourth Circuit, addressing almost the exact situation with contact with the preacher, said so in Barnes versus Joiner. And there at least needs to be an evidentiary hearing on that claim. And I think Godoy indicates that that evidentiary hearing is actually for the benefit of the state to rebut our declaration. On both of these claims, if there were to be an evidentiary hearing, who would conduct it? Would it be the state or the federal court? I think we can go back to the district court and conduct a hearing for the juror claim or the serology claim also. I think the standards would be different. I think, again, for the juror claim, there's a presumption of prejudice here. And so the burden would be on the state. But I think certainly the district court on a remand can conduct an evidentiary hearing on any of these claims. On your juror claim, how do you distinguish Crittenden? Your Honor, I think, so the district court relied on Crittenden and Fields versus Brown. And I think that the key distinguishing factor of both of those cases is that we're not dealing here with a juror bringing in extrinsic evidence to the juror and that's her own religiosity or morality. We're dealing with a juror's contact with a third party, which puts this case into a different category of clearly established law, which is Remmer versus United States. It's not so much about her considering her own morality as much as her contacting a moral authority in the outside world about her moral decision of whether to sentence Mr. Pinal to death. I mean, that's what makes this case fall squarely in line with Remmer versus United States and Godoy and Barnes versus Joyner in the Fourth Circuit and Warren at least a presumption. I see that my time is out, so I'll save the rest of my time for rebuttal unless there's other questions. OK, thank you. Good morning, may it please the court. Tony Estiville, Deputy Attorney General, on behalf of Respondent. I think as the court is aware, we but I do want to make clear as to the Pui claim. Assuming the truth of petitioner's allegations regarding the pre-trial DNA report, the prosecutor should not have presented that evidence about the tissue paper stain and Nicole being a possible contributor or at the very least, he should have made sure the jury knew that ultimately she was excluded as a contributor to that stain. But our argument is that had the jury known those facts regarding the tissue paper stain, the result of the trial wouldn't have been different. That's to say that there's no reasonable likelihood that the verdicts on guilt or conviction would have been different. That's because on the tissue paper, the import of that evidence is that it showed the mixture or purported to show the mixture between the mixture of Nicole's saliva and petitioner's semen. But if it doesn't have Nicole's saliva on it, then that evidence really becomes kind of superfluous. It's a tissue paper that was found in his trash can. So whether it could have possibly been related to someone else, it just doesn't have anything to do with this case. And it's probably evidence that wouldn't have been or shouldn't have really been presented. It's not evidence that exonerates petitioner anyway. But about counsel's position that you can't divorce the tissue paper from the scenario that Moore presented because the tissue paper was used in conjunction with the oral copulation according to Mr. Moore. Well, that wasn't Mr. Moore's testimony. That was a counsel argument. And I think that's what you kind of have when you're a prosecutor. You have these pieces of a puzzle when you try to put it together. And the way they put it together was she's spitting into the tissue while she's on the bed. And that's how you get the spots on the bed. But, you know, if you take out the tissue, then you still get. Sorry, the spots on the bed that contains Nicole's saliva and petitioner's semen, you still have those spots, you still have the dilution of sperm to saliva that is indicative of oral copulation. You have multiple stains instead of the one stain on the tissue that shows or that's consistent with being the product of oral copulation. Those two things aren't necessarily the tissue paper and the bedsheet aren't necessarily linked. The prosecutor did try to make that Lincoln argument, but that was, I don't know, I guess based on what they thought or how they were presenting that tissue paper evidence. But there isn't necessarily a link there. I always wonder why if the remaining evidence renders this false or misleading evidence immaterial, as you argue today, why the prosecutor had to knowingly put on false or misleading evidence in the first place? I don't know why the prosecutor did what he did. I mean, I have no idea. I don't know why you would. Perhaps he believed that the remaining evidence wasn't so overwhelming. So he had to stretch. I don't know that I don't I don't I don't share the opinion that the serology evidence was all that strong to begin with. I mean, that's something that I think even the trial court recognized because you do have the, you know, the A and the B match. But of course, it matches other people. And that was evidence that was brought out during trial. The statistics were brought out during trial in terms of how, you know, it didn't really narrow the group of people that could have been included as possible contributors to those samples. So I don't know that the tissue. Right. But particularly when this prosecutor had DNA evidence that he chose not to use, whether it was because it undercut the serology evidence he was putting on or or what. I mean, there's an argument there. But I mean, he had the actual DNA evidence, so he knew what the truth was. Correct, and what we have on the record is not not that particular prosecutor who present that evidence, but the main prosecutor, he said that they were not presenting the DNA evidence for tactical reasons and he didn't really go into explaining that. Our take on that is that the serology evidence did support the connection between Pana and Nicole, specifically with regard to the oral population conviction as opposed to the other ones, such that, you know, the DNA evidence isn't adding anything because those results, they either included Pana or they were inconclusive or with regard to the tissue paper excluded Nicole. It just the DNA evidence wasn't all that helpful. Not that it was hurtful. It just wasn't helpful. And that's why it wasn't presented. But why didn't petitioner at least make out a prima facie case before the California Supreme Court? Because materiality is has to be established. And that's something that that's the basis upon which we believe the California Supreme Court denied the claim. Because if you go conviction by conviction, looking at the oral population conviction, you you take out the tissue paper evidence and then you look at what else you have. We have the bed sheet. We have multiple stains. We have the mixture there. That was found to be not true, that allegation. The special circumstance of oral copulation. Right, right. Not on the special circumstances, but he was convicted of oral copulation. So I'm talking about some I'm in on guilt. So he was found guilty of oral copulation and penetration by a foreign object and sodomy and then the murder, which is based on felony murder. So with regard to the oral population conviction that's supported by the bedsheet evidence, which is stronger than even the tissue paper evidence, because you have that dilution and you also have multiple stains and you have that pattern that Moore testified was consistent with being the product of oral copulation. And then it doesn't go to the foreign penetration by a foreign object that was mainly shown through physical evidence with the scratches, the lacerations in the anal area and other physical evidence like that. That wasn't the mixture doesn't go to that. Isn't that a little inconsistent for the jury to find that the underlying conduct of oral copulation, but not to find it as a special circumstance? That was a claim that was, in fact, raised by Pana on direct appeal. And the way the California Supreme Court resolved that is they they felt that the jury could have found that the oral copulation occurred, but didn't occur in the context of the murder. As to the special circumstance, so there was oral copulation. But the murder didn't occur during the commission of the oral copulation. Instead, it was during the commission of sodomy and lewd acts. I thought I heard counsel say that with regard to the stains on the bedsheets, some were determined to be inconclusive and some excluded Parker. None of them excluded Parker. They didn't include they they were inconclusive. Let me make sure. I thought they were inconclusive and then they matched. Right. I thought some were inconclusive. Three were inconclusive and to match Mr. Pana only. Yes. But I mean, they didn't say Nicole was excluded, which is something you would expect them to say. They said that with regard to the tissue paper that she was excluded. She wasn't excluded from the bedsheet stains. And the same with regard to the robe. Those were the results were inconclusive and that that one wasn't the victim. That was excluded. That was Pana who was excluded, but it did match Nicole's blood blood on his robe. So that kind of goes to identity and some of the other issues I think counsels raised about the relevance of of the tissue paper evidence. But going back to the other convictions and the materiality on. The tissue with regard to the tissue paper evidence, it doesn't go to, again, the sodomy or the the penetration by a foreign object, as those are supported by other evidence and the tissue paper doesn't go to that. And again, as Judge Owens mentioned, there wasn't an oral copulation special circumstance. It was when you go to the special circumstances and then also with regard in I'm sorry. And even in closing argument, although the argument focused on the nature of the the the particulars of the crime, I mean, they kind of listed out these are the things that occurred. Well, with regard to the tissue evidence, it allowed the prosecution to paint a pretty powerful narrative as to how the crime happened. And the details were just incredibly graphic. Why didn't that have a material effect on the on the sentencing phase, given that the materiality standard under Naboo is not the same as, for example, Strickland prejudice or harmless error analysis? Right. But still, it has to be a reasonable likelihood of a different outcome. And so as to punishment, you know, that that is the narrative and that's the that they use the tissue paper evidence and the bedsheet evidence to to to guess how they used it. But also, I don't. They used it powerfully. They did. But also, how does that not have a material effect on the jury's decision to impose death versus a life sentence? Because there's powerful evidence of these other crimes, the sodomy and the penetration by the foreign object. And, you know, I suppose they didn't really go into maybe painting the picture of how that occurred. But the physical injuries on Nicole, she had marks on her face from her. It's understood under California law. It what it could not to be convicted of oral copulation. It cannot be a foreign object. It must be the. That's correct. So I misspoke. I meant lewd acts. So, yes, it penetration by a foreign object is in a special circumstance. It's lewd acts, which is any touching that's intended to arouse or gratify. So it's a rather broad category of things. So, yeah, they didn't paint the picture with those other offenses, but I think the physical evidence in of itself paints a rather dark picture of what happened to Nicole. I don't think that the oral copulation narrative added so much to that when you have, again, the marks on her face from the fingers and like her mouth being held closed and the marks on her neck from that could have possibly led to and you have, you know, the blunt force trauma. You have the scratches on her inner thighs and you have the different injuries to her vaginal area and to the anal area. I think that's that's plenty for the jury to to have in their head about the gruesomeness of the crime that the oral copulation narrative didn't add much. So that the tissue paper evidence wasn't material on the punishment. I think that's all I have on the Nipuhi claim that the California Supreme Court could have rejected that claim or reasonably rejected that claim on the tissue paper that it wasn't, it didn't show that the evidence was false. And then even with regard to the tissue paper showing that it was false, it ultimately wouldn't have made a difference in the outcome on guilt or punishment. All right. Thank you, Your Honors. Thank you, Your Honors. Just a couple more points. I think it's I want to just point the court to ER 382, which is the citation about two of the stains on the bed sheet being a definitive elimination. What page? ER 382, which does show that the victim was eliminated as a contributor to two of those stains on the bed sheet. And again, I think when you're looking at a grouping. We're talking Mr. Inman's report. Yes, Your Honor. Those stains gave a type 1.34 profile, eliminating the victim as a contributor and matching Mr. Pinnall. And again, I think it's important that that not only calls into question the other three inconclusive stains, but again, we have to look at there are A and AB antigens on that stain, meaning somebody else who's not the victim is contributing to them. So I do think that that bed sheet is relevant to undermining the entire mixture theory. There's not enough there for oral copulation or to show any sort of mixture with the tissue paper and bed sheet together, at least when we're looking at a prima facie case. And then the robe does definitively exclude Mr. Pinnall as a contributor. And that's on ER page 464. The other point I think is important that was raised by respondent is the other is the lack of direct evidence here. And she mentioned scratching. They tried to develop direct evidence between Mr. Pinnall and the victim other than this false serology. They took swabs of DNA underneath the victim's fingernails and Mr. Pinnall's fingernails at the hospital. They bound him up and actually ripped out pubic hairs from Mr. Pinnall trying to get DNA. No DNA was found for the victim in Mr. Pinnall's nails and vice versa. You also have the fact that there was no semen found. And I think respondents suggested that there's this acid phosphate on a slide that was semen, but Mr. Moore even testified that it's clear that he couldn't find semen because for semen to be present, there needs to be this P30 protein and that wasn't there. Rather, our experts have explained that acid phosphate can come from decomposition, which is the more likely explanation for that. At least when we're looking at the prima facie standard here, given that there was no P30 protein. So you don't have semen, you don't have DNA on the victim or Mr. Pinnall of each other. And what you have is a circumstantial case that again would become much more weak without this direct evidence. Unless there's any other questions. All right. Thank you very much, counsel. We will submit Pinnall v. Chappell and the session of the court is adjourned for today. This court for this session stands adjourned.
judges: Wardlaw, Nguyen, Owens